UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:02CR191(CFD) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| VINCENTE OJEDA | : | Date: April 14, 2005 |

## UNITED STATES' SUPPLEMENTAL SENTENCING MEMORANDUM

On January 13, 2004, the defendant Vicente Ojeda pleaded guilty to Count Ten of the Indictment, which charged him with knowingly and intentionally possessing with intent to distribute and distributing 5 grams of more of cocaine base in violation of 21 U.S.C. § 841(b)(1)(B)(iii).

The Presentence Report (PSR) grades the defendants criminal history category at VI, based on a scoring of 13 criminal history points.  See PSR at ¶¶ 41-49.  Additionally, because the defendant has sustained prior convictions for both a crime of violence and narcotics distribution, he is a career offender under U.S.S.G. § 4B1.1.  Accordingly, the PSR calculates the defendant's sentencing range at 188 to 235 months imprisonment.  See PSR at ¶ 70.  As the Government noted in its Memorandum in Aid of Sentencing, filed on or about March 29, 2004, the defendant did not object to the sentencing calculation and,

-2-

moreover, had not advanced any grounds for a departure.[1]  The
Government, similarly, is unaware of any basis for a departure
below the controlling sentencing range.  The Government does not
object to a sentence at the low end of the defendant's range.

**Sentencing Scheme post Booker**

In United States v. Booker, 125 S. Ct. 738, 2005 WL 50108
(2005), the Supreme Court held that the United States Sentencing
Guidelines, as written, violate the Sixth Amendment principles
articulated in Blakely v. Washington, 124 S.Ct. 2531 (2004).  The
Court determined that a mandatory system in which a sentence is
increased based on factual findings by a judge violates the right
to trial by jury.  As a remedy, the Court severed and excised the
statutory provision making the Guidelines mandatory, 18 U.S.C. §
3553(b)(1), thus declaring the Guidelines "effectively advisory."
Booker, 2005 WL 50108, at *16.  This ruling results in a system
in which the sentencing court, while required to consider the
Guidelines, may impose a sentence within the statutory maximum
penalty for the offense of conviction.  The sentence will be
subject to appellate review for "reasonableness."  Id. at *24.

---

[1]  The defendant did undergo a psychiatric examination, which
was performed by Dr. Theodore Mueller, M.D., Department of
Psychiatry, Yale University School of Medicine.  The Government has
received a copy of the $4000 invoice for Dr. Mueller's services,
which were rendered in November 2004, but has not been provided a
copy of the report.  Counsel for the defendant advised the court in
a letter dated January 20, 2005, that the defendant will not rely
on the doctor's report for sentencing purposes.

-3-

The Court of Appeals for the Second Circuit has summarized the impact of Booker as follows:

> First, the Guidelines are no longer mandatory. Second, **the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a).** Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

United States v. Crosby, 397 F.3d 103, 113 (2d Cir. Feb. 2, 2005) (emphasis added). When imposing sentence, a district court must be mindful that "Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." Id. Both the Supreme Court and the Court of Appeals expect "sentencing judges faithfully to discharge their statutory obligation to 'consider' the Guidelines and all of the other factors listed in section 3553(a), . . . and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice." Id. at 114.

In other words, a sentencing now involves two analytic stages: first, a determination of the applicable Guideline range

-4-

(including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in § 3553(a), there is any reason to impose a non-Guidelines sentence.

As to Stage One, the applicable Guideline range "is normally to be determined in the same manner as before Booker/Fanfan." Id. at 20; see id. at 19.  In limited circumstances, "precise calculation of the applicable Guidelines range may not be necessary" when a judge determines that either of two (not necessarily overlapping) ranges applies, and if "the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies." Id. at 21.  Such may be true in cases involving "complicated matters, for example, determination of monetary loss," or "close questions . . . as to the precise meaning or application of a policy statement authorizing a departure." Id. In general, however, Stage One requires the Court to engage in the familiar process of making factual findings by a preponderance of the evidence, and interpreting and applying the Guidelines to those facts in order to ascertain the appropriate sentencing guidelines range.

As to Stage Two, the judge must consider the guidelines in conjunction with the other factors enumerated in § 3553(a), in order to determine whether there is any reason to deviate from

-5-

the guideline range indicated in Stage One.  These factors
include: (1) "the nature and circumstances of the offense and
history and characteristics of the defendant"; (2) the need for
the sentence to serve various goals of the criminal justice
system, including (a) "to reflect the seriousness of the offense,
to promote respect for the law, and to provide just punishment,"
(b) to accomplish specific and general deterrence, (c) to protect
the public from the defendant, (d) "to provide the defendant with
needed educational or vocational training, medical care, or other
correctional treatment in the most effective manner"; (3) the
kinds of sentences available; (4) the sentencing range set forth
in the Guidelines; (5) policy statements issued by the Sentencing
Commission; (6) the need to avoid unwarranted sentencing
disparities; and (7) the need to provide restitution to victims.

Because the Guidelines reflect the Sentencing Commission's
considered judgment about all of the factors set forth in
§ 3553(a), the Supreme Court and the Second Circuit have made it
clear that the Guidelines continue to play a central role in a
sentencing court's § 3553(a) calculus.  Writing for the remedial
majority in Booker, Justice Breyer explained that sentencing
courts, "while not bound to apply the Guidelines, must consult
those Guidelines and take them into account when sentencing."
2005 WL 50108 at *27.  As the Court of Appeals has pointed out,

-6-

"the excision of the mandatory aspect of the Guidelines does not mean that the Guidelines have been discarded." Crosby, at 111.

> [I]t is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after Booker/Fanfan, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum. On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to "consider" the Guidelines and all of the other factors listed in section 3553(a). We have every confidence that the judges of this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice. In short, there need be no "fear of judging."

Id. at 113.

In the vast majority of cases, a sentence within the advisory guideline range will be the most effective way of promoting uniform, fair sentencing throughout the nation in compliance with § 3553(a). This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in Booker recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. See, e.g., Booker, 2005 WL 50108 at *21 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased

-7-

uniformity."); id. at *19 (same) ("Congress' basic statutory goal
-- a system that diminishes sentencing disparity -- depends for
its success upon judicial efforts to determine, and to base
punishment upon, the real conduct that underlies the crime of
conviction."); id. at *42 (dissenting opinion of Stevens, J.)
("The elimination of sentencing disparity, which Congress
determined was chiefly the result of a discretionary sentencing
regime, was unquestionably Congress' principal aim."); id. at *47
(dissenting opinion of Scalia, J.) ("the primary objective of the
Act was to reduce sentencing disparity.").  See also United
States v. Wanning, No. 4:03-CR-3001-1, slip op. at 6 (D. Neb.
Feb. 3, 2005) ("The Guidelines and their ranges were explicitly
crafted by the Sentencing Commission at the direction of Congress
to implement the statutory purposes of sentencing.").

    The Guidelines, aiming to achieve the uniform and
appropriate treatment of like crimes, represent the distillation
of 15 years of careful study of sentencing practices across the
country, and correlate as well to the varying severity of crimes
as defined by Congress.  The Guidelines, consisting of offense
characteristics and various grounds for departure, address all of
the considerations relevant to sentencing, as articulated in 18
U.S.C. § 3553(a), not least of which are the nature and
circumstances of the offense (which are covered thoroughly in
Chapters 2 and 3 of the Guidelines Manual), the history and

-8-

characteristics of the defendant (which are covered in Chapter 4 with respect to criminal history and Chapter 5 with respect to departures based on the most commonly considered personal characteristics), and the need to provide restitution to victims (Chapter 5, Part E).

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing outlined in § 3553(a), and should occur absent truly unusual circumstances. <u>See Wanning</u>, slip op. at 8-9 (concluding that "judges should, in the exercise of their newly minted discretion, normally follow the Guidelines, and the ranges produced by them, because that approach represents the best (though an imperfect) method of sentencing"). The government commends to the Court's attention the scholarly opinions of Judge Cassell in <u>United States v. Wilson</u>, 2005 WL 78552 (D. Utah Jan. 13, 2005) ("Wilson I"), and No. 2:03-CR-00882 PGC (D. Utah Feb. 2, 2005) ("Wilson II"), available at http://www.utd.uscourts.gov/reports/wilson2.pdf, which reach this same conclusion. As Judge Cassell explained, the Guidelines represent the product of an expert commission which has studied the sentencing process at great length, under the specific mandate of Congress to fashion recommended sentences that carry out the purposes defined by Congress. The resulting Guidelines plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress

-9-

has repeatedly approved of the Guidelines or acted to adjust them
to accord with legislatively determined policies.  Wilson further
observed that guided sentencing appears to have had a positive
impact in deterring criminal conduct throughout the country, and
thus serves the purpose of deterrence as well as punishment and
fairness.  Judge Cassell further observed that the Guidelines
provide appropriate guidance, which is fully consonant with
legislative policy, as to when particular offender
characteristics properly factor into the sentencing calculus --
for example, forbidding consideration of factors such as race,
religion, or socioeconomic status, and assigning only modest
weight to factors such as family ties, age, and civic
contributions.  Wilson II, slip op. at 17.  Importantly, Judge
Cassell properly concluded that one of the primary goals of the
criminal sentencing system is "equal justice under the law --
with a sentencing statute that mandates similar outcomes for
similar crimes committed by similar offenders."  Id. at 31.  "The
only realistic way to insure this is to follow generally the
Guidelines."  Id.  For all of these reasons, a court should "give
heavy weight to the Guidelines in determining an appropriate
sentence.  In the exercise of its discretion, the court will only
depart from those Guidelines in unusual cases for clearly
identified and persuasive reasons."  Wilson I, at *1.

-10-

Accordingly, a sentence within the guideline range is presumptively reasonable, and accommodates the congressional purpose set forth in § 3553(a), affirmed by the Supreme Court, of obtaining fair sentences which are uniform to the extent possible.  The government anticipates that only sentences outside the guideline range will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate, absent truly extraordinary circumstances.

## The Instant Case

The evidence developed by the FBI reveals that the defendant was a close and trusted associate of Sammy Virella, regularly assisting in the distribution of crack cocaine and powder cocaine.  See PSR at ¶ 25.  The FBI, using a cooperating witness, was able to purchase crack cocaine from Ojeda on February 24, 2002, February 27, 2002 and March 1, 2002.  See Indictment, Counts Nine, Ten & Eleven.  In addition, on April 7, 2002, Ojeda met with the CW and collected a $2,150 drug payment for a prior deal done with Virella.  See PSR at ¶ 24.  At the time the defendant committed these narcotics crimes, he was on probation -- having been convicted approximately six months earlier in the Superior Court for sale of narcotics.  See PSR at ¶ 47.

Although the defendant is a career offender, see PSR at ¶ 27, a status that automatically catapults him to a Criminal History Category VI, it is worth noting that his criminal record

-11-

totals 13 points and also provides an independent basis for a
Criminal History Category VI.  Mr. Ojeda's convictions primarily
concern violence and drug dealing.  At age 19 he was convicted of
Assault 3rd after having punched and bloodied a 15 year old
female.  See PSR at ¶ 43.  Several months after this incident,
Ojeda was arrested at Maloney High School after an employee heard
students shout "he hit her" and then saw the defendant shoving a
female student down the hall and into the girls' locker room.
See PSR at ¶ 44 (Ojeda was convicted of Criminal Trespass).  Mr.
Ojeda has also been convicted of Assault 2nd after having pushed
his sister off a porch, punching her in the head and hitting her
with a 14 ounce spinach can -- again bloodying his victim.  See
PSR at ¶ 46.  Ojeda has also been convicted of Possession of
Narcotics and Sale of Narcotics.  See PSR at ¶¶ 42 & 47.  He has
also demonstrated a lack of respect for the criminal justice
system, having been convicted of failure to appear and
interfering, see PSR at ¶¶ 45 & 48, and, as noted above, he
committed the instant crime while on probation for selling drugs
and only a short time after having been released from prison.
See PSR at ¶ 49.

     Thus, the nature and circumstances of this offense, which is
a serious felony drug crime, along with the history and
characteristics of this defendant, which reveal a violent,
impulsive and incorrigible drug dealer, suggest that a sentence

-12-

at the low end of the controlling guidelines range is reasonable
and appropriate.  The Government is not aware of any other
factors under section 3553(e) that militate in favor of a non-
guidelines sentence in this matter.

### Conclusion

The defendant has been in custody since his arrest on July
20, 2002.  As the Government noted in its initial Sentencing
Memorandum, Mr. Ojeda's written submission to the court seems to
be an appropriate statement of remorse and a sincere
acknowledgment of the seriousness of the criminal misconduct that
brings him before the court. The Government, therefore, does not
object to a sentence at the low end of the defendant's range,
which will still constitute a significant term of incarceration.

Wherefore, the United States does not object to a sentence
of 188 months' imprisonment.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


MICHAEL J. GUSTAFSON
ASSISTANT UNITED STATES ATTORNEY
157 Church Street
New Haven, Connecticut 06510
Tel. (203) 821-3748
Federal Bar No. CT 01503

-13-

## **CERTIFICATION OF SERVICE**

    This is to certify that the within and foregoing has been mailed, via first-class mail, this _____ day of April, 2005, to:

Jonathan Einhorn               Jacqueline Carroll
412 Orange Street            US Probation Officer
New Haven, CT 06511         United States Probation Office
                                 Connecticut Financial Center
                                 157 Church Street, 22nd Floor
                                 New Haven, CT 06510

MICHAEL J. GUSTAFSON
ASSISTANT UNITED STATES ATTORNEY